ELLEN CARNEY, Administratrix, *vs.* CHICAGO, ST. PAUL, MINNEAPOLIS & OMAHA RAILWAY COMPANY.

May 25, 1891.

Railway—Accident at Street-Crossing—Contributory Negligence.—In an action to recover for the killing of the plaintiff's intestate by a railway train while he was walking across the track at a street-crossing, *held*, that the evidence showed contributory negligence, in that he either failed to look or listen for an approaching train, or, if he saw it, in attempting needlessly to cross the track ahead of it.

Appeal by defendant from an order of the district court for Rock county, *Perkins*, J., presiding, refusing a new trial after verdict of $1,990 for plaintiff.

*James H. Howe,* for appellant.

*P. E. Brown, W. N. Davidson,* and *W. E. Akers,* for respondent.

DICKINSON, J.  This action is for the recovery of damages for the alleged negligence of the defendant in operating two locomotives drawing a regular passenger train on the defendant's road, and by which the plaintiff's intestate was struck as he was crossing the track. The negligence alleged consisted in running the train over a highway crossing, where the accident occurred, at a dangerous rate of speed, —30 miles an hour,—without giving any signal of its approach by bell or whistle, and by allowing the track to be obscured from the view of persons approaching the crossing by warehouses erected beside the track. It will be unnecessary to devote much attention to the issue as to the defendant's negligence in running the train at a dangerous rate of speed, and in omitting to give proper signals of its approach. The evidence tended to show negligence in these particulars; but it also, as we think, showed so clearly a case of contributory negligence on the part of the deceased that the verdict cannot be sustained. To this point attention is more particularly directed.

The accident occurred on the evening of the 4th day of January, 1887, at a point on the main track of the railroad where it is crossed by a public street called "First Avenue," in the village of Beaver Creek. At this point the railroad line is from the north-east to the southwest, but may for convenience be hereafter spoken of as being an easterly and westerly line. The street, approaching the railroad from the east, turns, and runs north across the railroad. There is a sidewalk on the southerly and westerly side of the street extending across the railroad to the corner of the depot platform. The depot is just north of the main track, and on the west side of the street. South of the main track, and seven feet distant from it, as appears by the testimony of the only witness who measured the distance, is a side track, parallel with the main track, and extending easterly from the depot some 600 feet or more. On the south side of the side track, and easterly from the crossing, were several warehouses and coal-sheds, the most westerly of which was about 100 feet east from the depot, according to the plat before us, showing the situation, and according to the testimony of one witness, who appears to have known the fact,

although some witnesses estimate the distance to be less. The most easterly of these buildings was about 600 feet east of the depot. There were some freight-cars standing on the side track by these warehouses, south of the main track. One approaching the crossing by this street from the south would be obstructed in his view of the railroad track to the eastward by these buildings and by the freight-cars on the south side track; and we assume that a train coming from the east on the main track would not be visible to a person so approaching the crossing until after he had come so near to the railroad that he could see along the main track on a line of vision north of the freight-cars. As one should go north, this line of vision eastward past the freight-cars would be more and more extended. The track curves slightly to the south, east of the station, and still more sharply further east; but while it is apparent that this would shorten the line of vision along the track to the eastward, yet it appears that even with cars standing on the south side track a person at the south rail of the main track could see eastward on the main track a distance of from 200 to 250 feet. The deceased was a man 53 years of age. He was the police marshal of this village, and acquainted with the situation. At the time of the accident the regular passenger train from the east was a little past due. The deceased walked towards the depot, on the south and west side of this street, for the purpose of meeting the incoming train. He walked across the south side track, and while crossing the main track, close to the depot platform, the train came up at great speed, and he was struck by a snow-plough on the forward engine. It had already become dark. There was a bright light fastened on the east end of the depot, which shone out to the eastward as well as to the south. There was some wind blowing from the north-west, and some snow in the air. The passenger trains were accustomed to come up to the depot at a slow rate of speed, at from 3 to 5 miles an hour. On this occasion, as is alleged in the complaint, the speed was 30 miles an hour. There was testimony estimating the speed at 40, 50, and even 100 miles an hour. No signal was given, except, as the jury found, a short whistle at a point about 600 or 800 feet east to the depot. There was a headlight burning on the forward engine, and visible, although its bright-

ness was somewhat obscured probably by the snow adhering to the glass.   The jury found that the deceased could not have seen the train or heard the whistle or noise of the train at any time before he got on the main track.

It seems to us to be so self-evident that Carney did not exercise the ordinary care which the law requires of one in his situation,—that of using his own senses of sight and hearing as a means of protection from a known danger,—that we would not be justified in sustaining this verdict.   He was familiar with the locality, and knew to what extent the view to the eastward was obstructed.   He knew that a train from that direction was to be expected at this time.   He was walking, and his movements wholly under his own control.   There was nothing in the situation to distract his attention, or to excuse a failure on his part to observe, if he could do so, before crossing the track, whether the train might not be so near at hand as to make it unsafe to cross.   The fact that the train was accustomed to come up to the station at a slow rate of speed would not excuse him from the duty of attention at such a place.   While it is true that the care which one ought to exercise may be measured to some extent by the danger to be apprehended, that does not justify one in needlessly placing himself in the track of such dangerous machinery, without watchfulness suitable to such a situation, relying implicitly upon the probability that a train will not approach at a rapid rate of speed.   While it might be deemed probable, from what was customary, that trains would come up to the depot slowly, one could not be certain that this would always be so.   The conditions connected with the operation of railroad trains are necessarily so varying that one could not, with reason, unnecessarily risk his life upon such a probability, by neglecting so simple and natural a precaution as the exercise of his own senses of sight and hearing.   As every one must be supposed to know, manifold circumstances may arise which may result in a locomotive or train passing or approaching a railway station rapidly.

Upon the conclusively established facts of this case it must be concluded either that Carney attempted to cross the track when he knew that a train was to be expected, and without either looking or listening for its approach, or else that, knowing the train to be coming, he

attempted to cross just ahead of it, miscalculating its speed. In either case his conduct would be negligent. It is a fact found by the jury that a short whistle was blown at a point about 600 or 800 feet east of the depot. The evidence shows conclusively that several persons who were in the depot building, the doors being closed, heard this whistle, and a considerable number then went out on the platform to meet the train. The deceased must at that time have been approaching the crossing, and very near to it. The case affords no reason for the conclusion that he would not have heard the whistle also, if he had been attentive. He was in the open air, and as near to the locomotive as were the persons within the depot. While the intervening warehouses and coal-sheds might to some extent interrupt the sound, it must have been as distinct where he was as within the closed room in the depot. But, even if Carney could not have heard the whistle, he could have seen the train in time to have avoided the danger. A moment's computation (and even that is hardly necessary) will show that he could have crossed the track in about a second, and if no train had been in sight when he came to the main track, none could have come upon him before he could have walked across. If the train was moving no faster than is stated in the complaint—30 miles an hour—it would require about five times as long or more for it to pass over the space covered by his range of vision as would be necessary for him to cross the track. Even if the plaintiff were not concluded by the averment in the complaint as to speed, and if the speed was 40 miles an hour, the train must have been within about 60 feet of Carney when he attempted to cross the main track. It must have been in sight if he had looked. His conduct was such that to us the conclusion seems unavoidable either that he did not look to see whether or not a train was approaching, or, if he did see it, that he rashly attempted to pass over the track in front of it.

Order reversed.