CHARLES ARINE v. MINNEAPOLIS & ST. LOUIS RAILROAD
COMPANY.

May 9, 1899.

Nos. 11,558—(68).

**Pedestrian Killed at Railway Crossing—Contributory Negligence—Evidence of Wantonness.**

> *Held* that, upon the evidence in this case, it conclusively appeared that plaintiff's intestate, who was killed at a railroad crossing, was guilty of contributory negligence in going upon said crossing without looking or listening, and that there was no evidence upon which a verdict could be supported that those in charge of defendant's train wantonly and wilfully ran such train over and killed said intestate, or that they failed to exercise due care, after discovering him in such dangerous place.

Appeal by plaintiff from an order of the district court for Carver county, Cadwell, J., denying a motion for a new trial. Affirmed.

The defendant also appealed from an order settling plaintiff's bill of exceptions.

*Child & Fryberger,* for appellant.

*Albert E. Clarke,* for respondent.

BUCK, J.

This action was brought to recover damages against the defendant railroad company for its killing Peter Ringberg, the plaintiff's intestate, at Hopkins, a small village in Hennepin county, on May 11, 1897. The case was tried in Carver county, and the jury rendered a verdict in favor of the defendant, and from the order denying a motion for a new trial the plaintiff appeals.

In their brief, the counsel for the appellant says that he does not here raise the question that the verdict was not justified by the evidence. As we understand this concession, it goes to the extent of admitting that the evidence was of such a character that it was proper to submit it to the jury, and that it justified the verdict, but that what he complains of is that the court, in giving its instruction to the jury, gave several of the defendant's requests which took from the jury all questions of wantonness on the part of defendant, which he alleges was his chief contention; or, stating the proposition more fully, he contends that contributory negligence on the part of Ringberg would not avail as a defense to the wrongful acts of the railroad company, if it wantonly inflicted the injury, for in such case the negligence of Ringberg would not be the proximate cause of the injury, and that it was incumbent on the defendant's servants, when they discovered Ringberg in a perilous place, to exercise ordinary care and diligence, depending upon the circumstances, to avoid running him down, and, if they failed to do so, that it amounts to wantonness.

That the deceased was guilty of contributory negligence is beyond controversy, for he attempted, while walking, to cross the railroad track in front of an approaching train, running rapidly, without looking or listening for it—that such action constitutes contributory negligence is too well settled to need the citation of authorities. And the rule is peculiarly applicable to a pedestrian, who has control of his own movements, and can stop in a moment, or readily and easily jump from the track, when he discovers his peril. The evidence upon this point was so overwhelming in favor of the defendant that it need not be discussed, but, upon the other question of wantonness, it is proper to examine the more salient points of the evidence.

The deceased was killed at the intersection of Excelsior avenue, in the village of Hopkins, and the main line of the defendant's railroad tracks, where the avenue crosses it at an angle of about 31 degrees. While Ringberg was walking along the sidewalk on Excelsior avenue, in an easterly direction, towards this crossing, the defendant's train was approaching it from the northwest, at a speed somewhere between 20 and 28 miles per hour. There was

nothing to prevent the deceased or the defendant's employees from seeing each other as each approached the crossing. The deceased neither looked nor listened as he approached the crossing, and went upon the same, and, when the defendant's engine was within about eight feet of him, he discovered it approaching him, and then leaped upwards and landed in the middle of the track. The engine struck him, threw him 15 or 20 feet against a cattle guard, breaking it, and then he rolled down an embankment, and died in a few minutes.

As the facts conclusively show that Ringberg was, as a matter of law, guilty of contributory negligence, the question now arises, does the evidence show wantonness on the part of the defendant's employees? If the evidence does not conclusively show it, the court might also, as a matter of law, have directed the jury to find a verdict in favor of the defendant, irrespective of its erroneous rulings, if any, except such as bear upon the admission or exclusion of evidence relating to the wantonness of the defendant's employees, because the instructions given, viz., 9, 10, and 11, even if erroneous as abstract questions of law, would not constitute prejudicial error. In other words, if, upon the evidence, it conclusively appeared that there was no wantonness on the part of the defendant's employees, the court had the right to direct a verdict for the defendant; and, if so, then whether the instructions assigned as error were right or wrong would be immaterial. Of course, the burden of proving wantonness on the part of defendant, and that it did not exercise due care after discovering the deceased in a place of danger, was upon the plaintiff. This leads to an examination of the evidence, but it may be well to say, in advance of such examination, that there was no objection made to the admission of any material evidence or exclusion thereof bearing upon the subject of wantonness; hence the main question is, does it conclusively appear that there was no wantonness on the part of defendant's employees operating defendant's train, resulting in the death of Ringberg?

The plaintiff called as a witness the fireman on defendant's train, who, after stating that the train consisted of two coaches, a combination car, and an engine and tender, and that the whole train was supplied with the Westinghouse brake, in good order, upon cross-examination further testified as follows:

"I remember that morning, as we approached this crossing where the accident happened, the usual signal was given for the crossing, and the bell was being rung from the mile post,—that distance back. As we approached still nearer the crossing, the engineer gave signals known as 'alarm signals.' These were given after the crossing signals were given. Those alarm signals consisted of short whistles right after the other regular alarm signals. As we approached the crossing, the brakes were applied by the engineer. The air was first applied, just before we approached one of those crossings,—the far crossing. That was done for the purpose of making the regular stop at the railroad crossing. After applying the air for the purpose of slowing up for the railroad crossing, the train run along for some distance. Then these alarm signals were given. The air was applied for the purpose of stopping quickly, about the same time that the alarm signals were given; and the emergency brake applied, and the engine was reversed about at the crossing where the accident happened. I have been on an engine a number of years, and have frequently seen engineers in charge stop trains quickly, by applying the emergency brakes, and by doing whatever else is necessary, in order to stop a train quickly. I think the engineer in this case did all he could to stop the train. The engine was about 250 or 300 feet from this crossing,—that is, the point where the accident happened when these alarm signals were given,—and about the same distance when the emergency brake was first applied, and everything else was done that was necessary and proper in order to stop the train as quickly as possible. I think that, under all the circumstances as they existed that morning, the stop made was as good as could be made."

He also testified that the emergency stop was first applied about 200 to 300 feet from the point of accident. Plaintiff also called as a witness the engineer on the train, who testified, on cross-examination:

"I was the engineer on train No. 15, May 11, 1897. Mr. O. F. Forsythe was our fireman. We were pulling three cars that morning. The way it came to happen that the speed was reduced from 25 to 30 miles an hour, down to 20 miles an hour, as we approached Excelsior avenue that morning, I saw a man approaching the track. I had an idea he was going to walk on the track about the time I would arrive at the crossing. As we approached Excelsior avenue with our train that morning, at a point about 200 or 250 feet back from the crossing, I applied the brakes to the train. At first, I made the service application. Next, a little heavier service application. The difference between the application of the service and the emergency brake is this: In making a service application, you pull the engineer's brake valve handle towards you, and it opens a

small port,—a small opening between the train-line pipe and the atmosphere,—and it lets out air from the train line; that is, it sets the brake by letting out the air,—by changing the position of the triple valve, lets the air out of a small drum in the ear, and lets the air in the cylinder, and that pushes on the brake. You pull the handle over, in the emergency, way over further in the corner, and that opens a larger hole between the atmosphere and the train line, and lets all the air out of the train at once,—lets it out a good deal quicker than the service application; opens a bigger hole, and lets the air out quicker, and, consequently, the brake goes on like that. The way I came to stop the train at the place I did stop it, was on account of an accident. The stop I made was an emergency stop. An emergency stop is a stop that is made just as quick as possibly can be made. I commenced to make this emergency stop 250 feet west of this crossing,—the sidewalk crossing."

Three other witnesses testified in behalf of plaintiff that the alarm signals were given by the defendant about at Seventh avenue, which is some 250 to 300 feet from the place of the accident; but they further stated that they did not see the train slacken its speed, but they all testified that they were watching the deceased, and one of them was shouting and swinging his arms to warn the deceased of his danger. None of them testified that the train did not slacken its speed, and it is evident that their attention was attracted to the deceased, as they all watched him from the time the alarm signals were given until he stepped upon, or was about to step upon, the track. Evidently, they did not watch the speed of the train. This is practically all of the material evidence tending to show wantonness on the part of the defendant's employees.

The defendant called the conductor as a witness, who testified that the usual crossing signals were given as well. There was evidence given by an expert witness tending to show that the defendant's train might have been stopped before it struck the deceased, but the most that can be said in that behalf is that, in connection with the other evidence, it merely tends to show negligence on the part of the defendant's engineer in not discovering the deceased in time to have avoided injuring him, but that would not have been such wilful and wanton negligence as to exclude the defense of contributory negligence nor warrant the plaintiff's recovery in this action. But we do not think that there was evidence to have justi-

fied the jury in finding that the engineer wantonly and wilfully injured the deceased, or that he discovered him in time to have avoided the accident. The trial court, upon the evidence, would have been justified in directing a verdict in favor of the defendant, and hence the other questions of irregularity and alleged erroneous instructions of the court are eliminated from the case.

Order affirmed.

CANTY, J.

I concur in the result. In my opinion, the test of liability in this case is not whether the engineer acted wantonly *and* wilfully, but whether he acted wantonly *or* wilfully. Neither do I find that there were any erroneous rulings, "such as bear upon the admission or exclusion of evidence relating to the wantonness of the defendant's employees."

The following opinion was filed on May 19, 1899:

PER CURIAM.

The defendant appealed from an order settling and allowing, against its objection, a proposed case. We are of the opinion that the order is not appealable. Defendant's remedy, if any, was to preserve its objections as it has done, and on the return of the same in plaintiff's appeal, to move to strike out the settled case. See Dayton v. Craik, 26 Minn. 133.

Defendant's appeal is dismissed.