ROSE WALKER v. ST. PAUL CITY RAILWAY COMPANY.[1]

November 22, 1900.

Nos. 12,340—(50).

### Street Railway—Signals to Stop Car—Duty of Passenger.

It is not the duty of a person seeking passage on an electric street car to assume that proper signals to stop the car will be disregarded, but such passenger may have regard to the probable conduct of the person in charge of the car, and act accordingly, when such reliance and action thereon are not apparently attended with danger.

### Same—Customary Speed.

It is not, as a matter of law, negligence for a person intending to take passage on a street car to assume that such car is running at the customary rate of speed, and to act with reference to such custom, in the absence of evidence to the contrary.

### Reckless Speed—Neglect to Stop—Passing in Front of Car.

Evidence considered, and held to support the finding of the jury that defendant negligently disregarded signals to stop one of its electric cars, which was run at a reckless rate of speed past the proper stopping place, and that plaintiff was not negligent, under the facts found by the jury in

1 Reported in 84 N. W. 222.

this case, in passing before such car, intending to enter the same as a passenger.

Action in the district court for Ramsey county to recover $10,000 damages for personal injuries. The case was tried before Bunn, J., and a jury, which rendered a verdict in favor of plaintiff for $3,000. From an order denying a motion for judgment notwithstanding the verdict or for a new trial, defendant appealed.   Affirmed.

*Munn & Thygeson,* for appellant.

*Henry Conlin,* for respondent.

Defendant owed the duty to every person who might be'at the point in question intending to become a passenger to anticipate his presence and the fact that he would be passing across in just the manner defendant had provided for him, and to be on the lookout for him. It was its duty to regulate the speed of its cars in approaching with reference to the probability of persons being there, so that the car could readily be stopped if people were discovered there or after being signaled a reasonable distance from the platform, and to stop its cars there when such signal was given.   Booth, St. Ry. § 347; Augusta v. Randall, 79 Ga. 304; Coller v. Frankford, 9 W. N. Cas. 477; Bowie v. Greenville, 69 Miss. 196; Strutzel v. St. Paul City Ry. Co., 47 Minn. 543; Anderson v. Minneapolis St. Ry. Co., 42 Minn. 490; Cincinnati v. Snell, 54 Oh. St. 197; Dahl v. Milwaukee, 65 Wis. 371; Humbird v. Union, 110 Mo. 76; Swain v. Fourteenth, 93 Cal. 179; Baltimore v. McDonnell, 43 Md. 534; Little v. Street, 78 Mich. 205; Ellick v. Metropolitan, 15 App. Div. (N. Y.) 556; Winters v. Kansas City, 99 Mo. 509, 519.   In the absence of statute or ordinance, the question what was, under the circumstances, a reasonable rate of speed was for the jury.   East St. Louis v. Burns, 77 Ill. App. 529; Shea v. St. Paul City Ry. Co., 50 Minn. 395; Holmgren v. Twin City R. T. Co., 61 Minn. 85; Howard v. St. Paul, M. & M. Ry. Co., 32 Minn. 214; Fullerton v. Metropolitan, 37 App. Div. (N. Y.) 386.   See also Bittner v. Crosstown, 153 N. Y. 76; Boyer v. St. Paul City Ry. Co., 54 Minn. 127; 2 Shearman & R. Neg. § 485 B.; Cooke v. Baltimore, 80 Md. 551; Newark v. Block, 55 N. J. L. 605; Flewelling v. Lewiston, 89 Me. 585; Pittsburgh v. Krouse, 30 Oh. St. 222.

Plaintiff was not guilty of contributory negligence. Thurber v. Harlem, 60 N. Y. 326, 332; Loucks v. Chicago, M. & St. P. Ry. Co., 31 Minn. 526; Garrity v. Detroit, 112 Mich. 369; Jetter v. New York, 2 Abb. Dec. 458; Langhoff v. Milwaukee, 19 Wis. 515; Thoresen v. La Crosse, 87 Wis. 597; Piper v. Chicago, 77 Wis. 247, 255; 2 Thompson, Neg. 1172; Johnson v. St. Paul City Ry. Co., 67 Minn. 260; Watson v. Minneapolis St. Ry. Co., 53 Minn. 551; Newson v. New York, 29 N. Y. 383; Gordon v. Grand, 40 Barb. 546; St. Louis v. Dunn, 78 Ill. 197; Cleveland v. Harrington, 131 Ind. 426; Robinson v. Western, 48 Cal. 409. Under any theory the case was at least for the jury. Kostuch v. St. Paul City Ry. Co., 78 Minn. 459; Lang v. Houston, 75 Hun, 151; Chicago v. O'Connor, 119 Ill. 586; McClain v. Brooklyn, 116 N. Y. 459; Erd v. City of St. Paul, 22 Minn. 443; Hooper v. Great Northern Ry. Co., 80 Minn. 400; Hendrickson v. Great Northern Ry. Co., 52 Minn. 340; Struck v. Chicago, M. & St. P. Ry. Co., 58 Minn. 298; Consolidated v. Glynn, 59 N. J. L. 432; Carroll v. Minnesota Valley R. Co., 14 Minn. 42 (57); Fonda v. St. Paul City Ry. Co., 71 Minn. 438. Plaintiff had a right to suppose the car would slacken its speed and stop when it had been signaled. Callahan v. Philadelphia, 184 Pa. St. 425, 427; Walls v. Rochester, 92 Hun, 581; Wharton, Neg. § 420; Beach, Con. Neg. § 163; Hoye v. Chicago, 62 Wis. 666; Farrell v. Waterbury, 60 Conn. 239; Allen v. Maine, 82 Me. 111, 117; Bronson v. Oakes, 40 U. S. App. 413; Grand Trunk Ry. Co. v. Ives, 144 U. S. 408, 417; Ernst v. Hudson, 35 N. Y. 9.

LOVELY, J.

Action for damages sustained by plaintiff while attempting to take passage on one of defendant's Interurban cars. Plaintiff had a verdict. After motion for judgment upon the verdict, or for a new trial in the alternative, which was denied, defendant appeals.

In adopting the required inferences in favor of the verdict, the following facts must be accepted as true on this appeal: The Interurban electric line between St. Paul and Minneapolis runs over University avenue upon double tracks, the eastern-bound cars running on the south and the western-bound cars on the north track, making it necessary for St. Paul passengers approaching a

car from the north side of the avenue to cross both tracks in order to enter the car gate, which opens on the south side on the stoppage of the car. At the first stopping place west of the Minnesota Transfer bridge there is a crosswalk leading from the sidewalk on the north of the avenue transversely across the same to plank platforms, sixteen feet wide, on either side of the car tracks, which were placed there by defendant. There was no sidewalk along the south side of the avenue, and the only purpose of the crosswalk or the plank platforms referred to was the convenience of passengers who had occasion to get on or off the cars at that point. The distance from the north sidewalk to the planking on the south side is sixty-eight feet. At the time of the accident all cars running over the Interurban line were required to stop at this point upon signal, and the public were apprised of this fact by a sign placed upon one of defendant's adjacent electric poles, which read, "Electric trains stop here." There were numerous business places and dwellings in the vicinity, and frequent occasion to stop the cars at that place, which is commonly known as "Minnesota Transfer."

At the time in question the plaintiff had been visiting friends near the Minnesota Transfer, and had gone to that point from St. Paul on the afternoon in question. Returning about 11 o'clock at night, she and two gentlemen went to the point on the north side of the avenue sidewalk where the plank crosswalk leaves the same for the street-car platforms. At this point an Interurban car coming from Minneapolis was discovered by its headlight approaching, more than seven hundred feet distant. One of the gentlemen (William Ryan) left plaintiff, and ran rapidly across the tracks to the south platform, for the purpose of signaling the car to stop. Plaintiff immediately followed, walking at a quick pace, supposing that she would have ample time to reach the platform before the arrival of the car. Ryan, standing on the platform, signaled the car with his hands in the usual manner several times. As near as the evidence can justify estimates of distances, the car was four hundred feet away when Ryan commenced signaling. The headlight of the car was burning brightly at the time, and enabled the motoneer to see ahead five hundred feet.

The plaintiff, going to the platform, looked in the direction of the

approaching car, once between the north rail and the sidewalk, and again while she was passing over the north rail, and says that it seemed to her at both times that the car was slacking speed. The glare of the headlight was so strong that she was unable to distinctly determine either its distance or speed, but was inclined to believe, from the signals that she had seen given for her benefit, that the car was coming to a stop, and, relying upon this fact, and that she would have time to cross the tracks in safety, kept on until at the moment of leaving the south rail she was struck and seriously injured by the approaching car, which was running at the rate of forty-five miles an hour, and was not stopped until three hundred feet beyond the place of the collision. There was evidence tending to show that the maximum rate of speed at this crossing, when no stoppage was to be made, was twenty miles an hour. The car in question had an admitted speed capacity of forty-five miles an hour, and there is nothing improbable in the view that it was running at that rate at the time of the accident.

The serious contention on the part of defendant is that the plaintiff was guilty of contributory negligence in passing in front of the car. If it is so clear, as a matter of law, that plaintiff's conduct was negligent, under the circumstances detailed, it is our duty to set the verdict aside and order a new trial. If not, the jury were the proper arbiters to determine this question, and we have no right to interfere with their conclusion. It must be conceded, in reviewing this record, that the defendant was negligent in disobeying proper signals, and in running its car at a reckless rate of speed over the crossing. Again, at the time the signal to stop was given by Ryan, for plaintiff's benefit, she had no apparent reason to doubt that it would be obeyed, or to doubt either that the car was running at its usual rate of speed at that place. If such had been the fact, there is no doubt that she would have had ample time to have passed safely over the tracks to the platform, which was the place provided by defendant to receive her as a passenger. It may be conceded that if the plaintiff was aware that the car was running at its full speed capacity, and knowingly took chances in rushing before it, her conduct would have been negligent, but this is far from being clear.

The evidence shows that the injured lady was above the average

stature, and, with her wearing apparel, it would have been extremely difficult for her in the nighttime, to have moved faster than a quick walk. It is true that she moved rapidly from the sidewalk to the south platform, but not more so than is usual among people taking passage on electric cars, the movements of which are often characterized by haste, in an anxiety to make quick time. She states that she walked quickly, for fear that she would be left, which supposition is not unreasonable. She might not, in the nighttime, accurately determine the speed of the approaching car by its headlight. Neither do we think the claim of counsel that she must have known of its speed from observing the flash of the car lights upon the poles by the side of the track is certain. She was not required, if she could do so, to make nice calculations of that kind. Nor, as a matter of law, can we hold that plaintiff was bound to divert her steps from the crosswalk, which was the usual and proper approach to the platforms, in order to go around to the rear of the car. Had she done so, the car might not have waited for her, and such a diversion required her to leave a safe and convenient place for foot travel to pass upon the uneven irregularities of the highway, and to pick her way over four tracks, and to adopt this insecure course upon a supposition that the car would disregard proper signals, and run by her at a reckless rate of speed. Had there been good reason for such a supposition, she should not, and probably would not, have approached the car at all.

After plaintiff had observed the car the last time before she was struck, the inference is not unreasonable, and may have been adopted by the jury, that she walked upon the south track when the car was one hundred feet distant. If she then knew it was running forty miles an hour, and was disregarding her signals and would not stop, it might be said, as a matter of law, that she was negligent in going forward; but we cannot, without weighing diverse speculations and usurping the functions of the jury, decide upon the effect of the headlight upon her vision, or the reasonableness of her necessarily instantaneous views at the time. It may have been extremely difficult to discriminate between the effects of a headlight at night, and decide upon its probable distance, or to calculate upon the rate of speed of the car; and it must not be forgotten either that

the judgment of plaintiff in these respects may have been influenced by the reasonable supposition that the car was running at its proper speed, and that it would stop upon the signals given for her benefit.

We cannot hold, upon the record, that such suspicions as would convict this plaintiff of contributory negligence must be indulged in by those who patronize defendant, to relieve it from the consequences of its own misconduct. Amidst the complicated affairs of city life in the use of street cars by their patrons, the same confidence should be indulged in in behalf of passengers that is due on the other hand to the company. Neither are obliged to assume that legal duties by the other will be neglected, where the instincts of self-preservation by the traveler or the demands of duty by the company require the exercise of proper care; and, under the circumstances of this case, it was not, as a matter of law, negligence for the plaintiff to assume and rely upon the fact that defendant would perform its duty and pursue the regular and usual course.

We cannot, in passing upon the conduct of the injured lady, criticise her course of action, or censure her for want of care, because, in the light of subsequent events, it can be seen how she might have avoided the unfortunate accident; for, as expressed by high authority,

"If the character of an act, by which one exposes himself to peril, is to be judged by its result alone, a person should, in most cases, be condemned as negligent who should voluntarily place himself in a position of possible danger, and harm should come to him." Thurber v. Harlem, 60 N. Y. 326, 332.

It is always possible that injury may follow from the negligent acts of others, but to assume beforehand that it will occur in any case is more than the law demands in behalf of defendant, and requires a greater caution than the majority of us exhibit in the affairs of daily life. This reasonable rule has not been better stated abstractly than by this court in an early case, where it was held that

"One who is called upon to exercise care to avoid danger from the acts of others, may, in regulating his own conduct, have regard to the probable or apprehended conduct of such other persons, and to the presumption that they will act with reasonable caution and not with culpable negligence." Loucks v. Chicago, M. & St. P. Ry. Co.,

31 Minn. 526, 18 N. W. 651,—citing Ernst v. Hudson, 35 N. Y. 9; Reeves v. Delaware, 30 Pa. St. 454; Kennayde v. Pacific, 45 Mo. 255; and Langhoff v. Milwaukee, 19 Wis. 515.

The case last cited was one of collision between a pedestrian and a locomotive. It was argued by eminent counsel, and, in the opinion of the court, Dixon, C. J., appropriate to the view we have taken, says:

"It must be assumed that she knew the law, and knowing it she might properly assume that the defendants were acting in conformity to its provisions. Seeing the trains at such a distance from the intersection of the street upon which she was passing, that she might safely cross if they had been moving at a lawful rate of speed, she might well have exercised less care and watchfulness, without the imputation of negligence, than if there had been no such limitation. It is not an easy matter for one standing upon or near the track to judge correctly of the speed of an approaching train."

The case at bar is stronger in the facts which relieve plaintiff from contributory negligence than the one last cited. In this case, added to the right to expect a reasonable and customary speed, plaintiff also had a right to suppose that the street car would stop for her at the time she passed on to the catastrophe she could not anticipate. Later decisions of courts of the highest respectability affirm these views. Garrity v. Detroit, 112 Mich. 369, 70 N. W. 1018; Jetter v. New York, 2 Abb. Dec. 458; St. Louis v. Dunn, 78 Ill. 197; Cleveland v. Harrington, 131 Ind. 426; Robinson v. Western, 48 Cal. 409; Johnson v. St. Paul City Ry. Co., 67 Minn. 260, 69 N. W. 900; Watson v. Minneapolis St. Ry. Co., 53 Minn. 551, 557, 55 N. W. 742. We might further sustain this reasonable rule by a citation of many other authorities, but it is unnecessary. The charitable presumption that our fellow men will treat our rights to personal safety with due respect is founded in the instincts of nature, the demands of necessity, the dictates of humanity, as well as the practical experiences of common life; and we shall not disturb its beneficial influence by holding that, under the circumstances of this case, the consequences of defendant's negligence can be visited upon the victim for her mistaken belief that its servants would do their duty in her behalf.

We are aware that there are decisions (cited from this court) where it has been held that parties approaching a railway crossing at grade must, at their peril, look and listen for approaching trains; also, that parties crossing the street in front of a rapidly approaching car have no right to rush in front of it, and do so at their peril. Leading cases to support this view are Carney v. Chicago, St. P., M. & O. Ry. Co., 46 Minn. 220, 48 N. W. 912; Hickey v. St. Paul City Ry. Co., 60 Minn. 119, 61 N. W. 893; Terien v. St. Paul City Ry. Co., 70 Minn. 532, 73 N. W. 412. The duties of a traveler at a steam-railway crossing and of a pedestrian on a street used by a street-railway company are not parallel, in several respects. The distinction has been pointed out in Shea v. St. Paul City Ry. Co., 50 Minn. 395, 52 N. W. 902, to which we refer; but, in the several cases cited above where recovery was denied, the misfortunes which were held to be remediless occurred in each case where it was apparent that the injured party had no right to suppose that the car would stop, but endeavored, without excuse or being misled by the defendant, to pass in front of it. We have noted the facts above which distinguish the case at bar from those referred to, viz. that the car in this case was expected to stop, and that plaintiff had a right to indulge in that expectation, and, to a certain extent, regulate her conduct accordingly.

In conclusion, we emphasize the fact that this is a review of the action of a jury, and has passed the critical consideration of an able and impartial trial judge. A different question is therefore presented than was before the jury or the trial court. We repeat, if it conclusively appeared that plaintiff was herself guilty of the negligence that was the proximate cause of her injury, it would be our duty to set the verdict aside; but upon this contention there were opposing views to be taken of her conduct, upon which the opinions of candid men might differ. The jury have said plaintiff was not negligent, the trial court approves that finding, and we cannot disturb the result without depriving the successful party of her constitutional right of trial by jury, which we decline to do.

The order of the trial court is affirmed.

COLLINS, J. (dissenting).

I dissent. The place where the accident occurred is well known to all who travel on the Interurban car line along University avenue. It is about seven hundred feet west of the long bridge over the Minnesota Transfer Company's tracks, and, although within the limits of the city of St. Paul, the neighborhood is wholly suburban in its character,—so much so that no streets have been opened across the avenue for more than twelve hundred feet on either side of the point where plaintiff was injured, and the cars are not stopped for passengers, except at intervals of about seven hundred feet; and this without regard to intersecting streets, which exist on paper only, signs being put up to indicate these stopping places. On the south side of this avenue, and just west of the bridge, are three or four buildings; and then for a space of about four hundred feet east of the point where plaintiff was injured, and for about one thousand feet west therefrom, there are no buildings in sight, except defendant's car barn and a few stock sheds and corn cribs; the country being open commons. North of the avenue there are a few buildings at the end of the bridge, and then west for a space of about two hundred feet to the place of the accident, and for over eight hundred feet to the west of that place the only building on the avenue is a small hotel or boarding house. Back from the avenue, northerly, some three hundred or four hundred feet, are a half dozen houses. It is safe to say that there are not to exceed one dozen dwellings of any description within one thousand feet of the point where plaintiff was injured. The locus in quo was in fact no different from that involved in Wosika v. St. Paul City Ry. Co., 80 Minn. 364, 83 N. W. 386, except, probably, that more people travel on the University avenue line of electric cars than upon the Seventh street line. From the bridge for nearly a mile westerly the avenue is nothing more than a well-traveled country road, as was Seventh street where the Wosika accident occurred.

The night was very dark. The plaintiff had never gotten on or off the cars at that point, and was comparatively a stranger in that locality. It was after 11 o'clock in the evening when she and her companions discovered the car approaching, with a very bright headlight, in plain sight. They were then on the north sidewalk of

the avenue, at the end of the crosswalk which led to the planked stopping place, and at least seventy feet from the southerly rail of the south track, on which was the approaching car. In the opinion of the witness Ryan, the car, when they first saw it, was about seven hundred feet away, which would locate it about three hundred feet west of the hotel before mentioned. Ryan ran immediately, as fast as he could, to the south, crossed the tracks until he came to the south rail, and there gave his first signal to the motoneer. He was in plain sight at that time, because of the powerful headlight, and the car was four hundred feet away,—about opposite the hotel. He continued his signals, and plaintiff saw this until the car was within one hundred fifty feet, when the light was so strong in his eyes that he was obliged to step to one side.

When plaintiff first saw the car, "it looked to be quite a ways. I couldn't say how far." She knew that Ryan ran as fast as he could to signal, and she saw the signals given. She followed Ryan "on a quick walk," looked up when she was on the north track, and saw the car crossing about two hundred feet distant (halfway to the hotel). "It looked as though it was slacking up." `It made a good deal of noise, and she heard it.

"I couldn't tell the rate it was coming," and "I went right on, and when I crossed over the second track I looked again up the track, and I couldn't see anything, for the headlight was so strong it seemed to kind of— I couldn't see the car then."

On cross-examination, questions were asked, and the plaintiff answered, as follows:

"Q. And that was while you were in the middle of the track,—the first track? A. Of the first track. Q. And you looked down and saw that car, and saw the headlight on it, and saw it was running? A. No; I seen it when I was in the middle of the track. I seen it more to the side. Q. You could see the side and see the front, and what kind of a car it was? A. Yes; I could see the car was coming. Q. And then you took some steps until you got up to, or close to, the last track? A. Yes; just as I was going over the first track I looked up again, and I couldn't see anything but the headlight. Q. Well, that shone right out in your face. A. Yes; it was very bright there. Q. Of course, you had seen that when you looked the first time? A. Not the headlight. Of course, I seen it, but it

didn't affect my eyes any. Q. But you saw it was bright and strong? A. Of course, it was bright, but not so strong as when I was in front. Q. And when you looked again, you say that— A. I looked that once there, when I was on the last track. Q. And you looked again before you crossed the last track? A. Yes, sir; I suppose the car was stopping, because Mr. Ryan was right there to stop it, and I thought it was stopping. Q. * * * Now, let me understand you. Now, you looked when you were in the middle of the first track? A. Yes, sir. Q. No question about that. Looked square at this car then, and you took a step or two more? A. Yes, sir. Q. And you looked again? A. Yes, sir. Q. And you were hurrying for fear that that car would run away? A. I was afraid I wouldn't be on the right side to take the car. I thought it wouldn't wait for me if I wasn't there. Q. And that is the reason you hurried across the track in front of the car? A. Well, yes; certainly. I thought the car was stopping."

Again, when examined concerning her knowledge of the local custom to stop after the rear of the car had crossed the intersecting street, or had reached the place to get on and off:

"Q. What I want to get at is, didn't you know that that car, or didn't you expect that car, to stop, with the rear end of it at the point where you were crossing? A. Well, I didn't know it might go further than what I was. Q. And you expected, of course, it would go at least that far, so that the rear end would be where you were crossing? A. I thought it had already stopped before. I thought it had already stopped when I seen the light. I shouldn't cross, certainly, if I hadn't thought it had stopped."

Later on the last answer was qualified by the witness stating that she meant to say, not that the car had stopped, but that it had slackened its speed. And finally she testified:

"Well, I thought, by the looks of it, it was going to. It was slacking up. I thought I was perfectly safe to cross it, because I didn't think I was in any danger whatever, just the same as if you cross down town here on a crossing when cars is coming. I thought I was perfectly safe, as long as he was ahead of me, to flag the car, and would have been over all right if he had slacked up the least bit, because I was most over."

Of course, there was the usual contradiction between witnesses, especially as to the rate of speed attained by the car, and as to when Ryan gave the first signal; the motoneer claiming, on the last point, that he did not signal until it was too late to stop at the usual place.

But, taking the most favorable view of the case made out by the plaintiff, I regard it as the clearest example of contributory negligence, almost amounting to criminal carelessness, ever presented in this court. I am also of the opinion that well-established rules long since adopted here, and in the past consistently and strictly adhered to and applied, have been departed from and practically wiped out of existence. I am also of the opinion, and cases hereinafter cited will show, that the doctrine of contributory negligence, as laid down in the courts in other jurisdictions, has either been steadily misapplied, or that the decision here is radically wrong and directly at variance with what has been regarded as settled law.

This is not a case where the person injured did not look or listen for the car, nor one where she came suddenly upon an unexpected unknown danger, nor one where, because of some obstruction, the approaching car could not be seen. On the contrary, she knew the car was coming, for she saw it when she was seventy feet from the rails on which it was running. She had it in mind as she crossed the street, and she did not forget or neglect to again look when she was between the rails of the north track, ten feet from a dangerous place, and in perfect safety. The headlight then blinded her eyes so that she could not tell where the car was, or how far distant, and yet she persisted in hastening in front of it, simply because she was anxious to be on the side on which the gates opened, that she might promptly get on board. She acted on the belief, as she testified, that the car had stopped, or was stopping, in response to Ryan's signal. This excuse might be given by any person who runs in front of a moving car or locomotive as it approaches a stopping place or station. There is not a recent case in the books in which such an excuse has been held adequate. The car had not stopped, nor was it stopping, when she attempted to cross the track. It was going at the time at the very unusual and rapid rate of speed of about forty miles per hour. It seems incredible that she could have thought or been led to believe that the car had stopped or was stopping, or even slacking up, when it was in fact running at such a furious speed. Had she paid the slightest attention to the car, she could not have failed to discover the great danger and peril of at-

tempting to cross in front of it. And the conclusion is inevitable that she was utterly unmindful of her surroundings or situation.

It may be true that she supposed the car would stop, but she had no right to go blindly upon the track in reliance upon such supposition. Again, there was no reason whatever for hastening across the track. This was not a case where, if the car had stopped, plaintiff would have crossed the rails in front of it; for its usual stopping place was beyond, or east, of the point where she crossed. If this point had been west of the point where plaintiff hastened into the dangerous place, there would have been some excuse for her carelessness, al-though insufficient in law; for it might have been argued with some plausibility that she would have been justified in assuming that the car would stop at its usual place, before it reached the point where she crossed. Nor was it at all necessary for her to cross in order to give the signal, for that had been done by Ryan. She knew this, and, as she says, thought the signal had been acted upon by the motoneer. She could have stood in a place of safety, just where she was, when the light blinded her eyes, until the car passed; and when it had stopped she could have safely stepped in its rear without stepping off the planking, and have reached the gates before they were fairly open. Her further reason for crossing, that she was afraid the car would not wait, is equally untenable; for Ryan was on the right side for the express purpose of signaling and hold-ing the car for his companions. Even if there was insufficient time for her to go behind the car and board it, the exercise of reasonable prudence would have demanded that she should remain out of the way of a car of the class which are ordinarily run on the Inter-urban line, of nearly two hundred horse power each, of great weight, capable of seating sixty people, and with a speed capacity of from forty to forty-five miles an hour.

The established doctrine of this court in reference to contributory negligence, before referred to, may be found stated in a number of cases. Perhaps that of Carney v. Chicago, St. P., M. & O. Ry. Co., 46 Minn. 220, 48 N. W. 912, is more directly in point than any other. Carney was killed when attempting to cross defendant's tracks on a street immediately contiguous to its depot building. The facts were that the night was dark, and there was some snow in the air.

81 M.—27

Passenger trains were accustomed to approach the depot near where the accident occurred at a slow rate of speed,—at from three to five miles an hour.   On the occasion in question there was evidence that the speed of the train was forty, fifty, and even one hundred miles an hour.   The court said:

"It seems to us to be so self-evident that Carney did not exercise the ordinary care which the law requires of one in his situation,— that of using his own senses of sight and hearing as a means of protection from a known danger,—that we would not be justified in sustaining this verdict.   *   *   *   He was walking, and his movements wholly under his own control.   There was nothing in the situation to distract his attention, or to excuse a failure on his part to observe, if he could do so, before crossing the track, whether the train might not be so near at hand as to make it unsafe to cross. The fact that the train was accustomed to come up to the station at a slow rate of speed would not excuse him from the duty of attention at such a place.   While it is true that the care which one ought to exercise may be measured to some extent by the danger to be apprehended, that does not justify one in needlessly placing himself in the track of such dangerous machinery, without watchfulness suitable to such a situation, relying implicitly upon the probability that a train will not approach at a rapid rate of speed.   While it might be deemed probable, from what was customary, that trains would come up to the depot slowly, one could not be certain that this would always be so."   See also Studley v. St. Paul & D. R. Co., 48 Minn. 259, 51 N. W. 115; Arine v. Minneapolis & St. L. R. Co., 76 Minn. 201, 78 N. W. 1108, 1119.

These were cases arising out of accidents upon steam railways, but it seems to me that it is wholly immaterial what power is used, —whether steam or electric,—and that it is also immaterial whether the injured party is guilty of contributory negligence at the crossing of a country road or in a city street.   No such distinction was made in Hickey v. St. Paul City Ry. Co., 60 Minn. 119, 61 N. W. 893, in which it was assumed that the electric car was running at an unreasonable and unlawful rate of speed, and it was held that

"A person about to cross a street along which cars are propelled by electricity, having full appreciation that to do so he must act hastily or be run down, is guilty of negligence per se, if he rushes upon the track without listening or looking for the whereabouts of a car which he expects and knows is rapidly approaching the place of crossing."

Another case in which the plaintiff failed to look and listen for a street car and was run down, is Terien v. St. Paul City Ry. Co., 70 Minn. 532, 73 N. W. 412. He was guilty of contributory negligence per se, which precluded a recovery. See also Greengard v. St. Paul City Ry. Co., 72 Minn. 181, 75 N. W. 221; and Wosika v. St. Paul City Ry. Co., supra.

It should be said in passing that in these cases the injured parties failed to look, and therefore failed to see the approaching cars, and for that reason were held guilty of contributory negligence, while in this case the party did look, and not only did see, but saw so indubitably that she was blinded by the headlight, and then immediately disregarded the warning. The lesson to be gathered from the main opinion is that it is safer, in case injury results, for the person who rushes in front of a car to see it and appreciate its presence, than it is to ignore its approach by failing to look, or, looking, by failing to see. Carelessness and indifference which result in ignorance of the impending danger are of no avail as against a charge of contributory negligence, but full knowledge thereof and a total disregard of such knowledge relieve and release the party.

Referring again to cases outside of this jurisdiction, it has been said that, as the use of electricity as a motive power has increased the degree of care to be exercised by street-railway companies,

"The reverse of the proposition would seem to be reasonable; that is, that by the application of electricity as a motive power for street cars, travelers, either on foot or in vehicles, should be held to a higher . degree of care than before its use." Siek v. Toledo, 16 Ohio Cir. Ct. R. 393.

And it has been held that

"A person in crossing a street having street-car tracks thereon, is bound to exercise the same degree of care which it is incumbent upon the railroad company to exercise." Burgess v. Salt Lake City, 17 Utah, 406, 53 Pac. 1014.

But whether these propositions are correct or not, the following very recent cases are authority for the statement hereinbefore made,—that this plaintiff herein should be held guilty of contribu-

tory negligence as a matter of law: Jacksonville v. Lamb, 86 Ill. App. 487; Griffith v. Denver Co., 14 Colo. App. 504, 61 Pac. 46; Helber v. Spokane, 22 Wash. 319, 61 Pac. 40; Knocker v. Canal, 52 La. An. 806, 27 South. 279; Blaney v. Electric, 184 Pa. St. 524, 39 Atl. 294; Watkins v. Union, 194 Pa. Sup. 564, 45 Atl. 321; Lyons v. Bay, 115 Mich. 114, 73 N. W. 139; Macon v. Holmes, 103 Ga. 655, 30 S. E. 563; Hickman v. Nassau Co., 36 App. Div. (N. Y.) 376; May v. Metropolitan, 26 Misc. (N. Y.) 748; Petri v. Third, 30 Misc. (N. Y.) 254; Lau v. Lake Shore, 120 Mich. 115, 79 N. W. 13; Bennett v. Detroit (Mich.) 82 N. W. 518. The two cases last cited emphasize what has been said here concerning an enforcement of the rule, because the persons injured were bicycle riders, and all courts have required a higher degree of care upon the part of pedestrians, who have easy and prompt command of their movements, than of persons who are riding or driving or wheeling.

I am opposed to the doctrine that although a failure to look for an approaching car, and, as a consequence, a failure to see it, will not relieve an injured party from the charge of contributory negligence, full and complete knowledge of such approach will excuse and avoid a reckless disregard of such knowledge. The order appealed from should be reversed.

BROWN, J.

I concur with Justice COLLINS.