GRACE MARY GRAHAM v. MINNEAPOLIS, ST. PAUL & SAULT STE.
MARIE RAILWAY COMPANY.[1]

May 26, 1905.

Nos. 14,306—(103).

**Contributory Negligence.**

> When a yardmaster, in the discharge of his duties, is required to oc-
> cupy places of danger, he may, in regulating his conduct, rely upon the
> custom of the railway company in the movement of its trains and engines.
> *Held*, under the circumstances of this case, the plaintiff's intestate was
> not, as a matter of law, guilty of contributory negligence, or assumed
> the risks of working at the place.

Action in the district court for Hennepin county by plaintiff as
administratrix of the estate of Robert H. Graham, deceased, to recover
$5,000 for the death of decedent. The case was tried before Pond, J.,
and a jury, which rendered a verdict in favor of plaintiff for the sum
demanded. From an order denying a motion for judgment notwith-
standing the verdict or for a new trial, defendant appealed. Affirmed.

*Alfred H. Bright,* for appellant.

*Frank D. Larrabee* and *Mathias Baldwin,* for respondent.

LEWIS, J.

Defendant company, as lessee, had the right to use certain of the
Northern Pacific Railway Company's tracks in Minneapolis. In that
portion of the company's yards involved in this case there was a
certain switch shanty, a one-story building, 12x36 feet, for the use and
benefit of yardmasters and switchmen, located south of the main tracks,
and about five hundred feet east of the roundhouse, the north side of
which was about five feet south from the southerly rail of the east-
bound main line track. Between the building and the track was a plat-
form about four feet wide, upon which, standing against the building,
with the exception of the westerly portion, was a bench about sixteen
inches wide. The building consisted of a west and east room; the
former opening upon the platform by a door facing the track, and the

[1] Reported in 103 N. W. 714.

95 M.—4

latter upon the platform at the east end of the building. The two main line tracks are connected with other tracks by means of switches both to the east and west, and during the time in question, at a distance of about ninety feet west from the west end of the switch shanty, at a point where another track crossed the east-bound main line track, was a switch tended by a switchman. Several hundred feet east of the switch shanty were other tracks leading to the main track in question, and switches connecting therewith. What is known as the "Plymouth Avenue Bridge" was located several hundred feet west, and the coal shed was on the south side of the main tracks, and the east end of it was in the neighborhood of seven hundred feet west of the west end of the switch shanty. It was conclusively shown that defendant company had for a long time been in the habit of running its passenger locomotive easterly every evening about five o'clock on the east-bound main line track, next to the switch shanty, from the general yard to the Milwaukee station, to take out the east-bound passenger train, and that all trains and locomotives of the Northern Pacific Company coming into the city from the west also came in over the main line on the same track.

Plaintiff's intestate, Robert H. Graham, was employed by the Northern Pacific Company as assistant yardmaster, in which capacity he served at the place involved for a number of years. The platform in front of the switch shanty was a perilous place, because the pilot beam on the engines extended over the platform, leaving only about two feet of clearance between it and the wall of the building. About five o'clock in the afternoon of February 3, 1904, Graham, in the discharge of his duties as yardmaster, was in the west room of the switch shanty, giving directions to certain switchmen. He passed out of the door to the platform, and proceeded to walk eastward along the platform in front of the shanty, when defendant's engine rapidly approached from the west, overtaking him either near the east end of the building, or after he had passed it, the pilot beam striking him under the left shoulder. He was picked up at a point about twelve feet east from the east end of the switch shanty, and death resulted either from the blow of the pilot beam or from concussion received from the fall. A verdict having been returned for plaintiff, defendant moved for judg-

ment notwithstanding, and, the same having been denied, appeals from the order, and also from the order denying its motion for a new trial.

There is evidence reasonably tending to support the claim of plaintiff that it was a custom of long standing for the engine passing easterly through the yards in front of the switch shanty regularly every evening at five o'clock to slow down after passing the Plymouth Avenue Bridge in order to receive the signal from the switchman at the switch ninety feet west of the shanty, and it was that switchman's duty to post himself by observations to the east, and ascertain whether the track was clear, and, if so, to give the signal to the engineer of the approaching engine to go ahead. In order to receive this signal, it was the custom of the engineer to slow up the engine as he approached the switchman to a speed not exceeding eight miles an hour, and to pass through the yards beyond the switch shanty with his engine under control or running not faster than six to eight miles an hour. There is also evidence to the effect that at the time in question the engineer in charge of the approaching engine did not comply with the custom and slow down the engine, but proceeded past the switch shanty without diminishing the speed at all; and several witnesses stated he was running from eighteen to twenty miles an hour. There was a conflict in the evidence as to whether the engineer rang the bell or gave other signals of warning. Whether or not signals were given was plainly a fact for the jury. It must be conceded that under the circumstances the engineer in charge of defendant's engine was guilty of negligence in so running the engine through the yard contrary to the general custom, and defendant is liable for the consequences, unless it appears, as a matter of law, that Graham was guilty of contributory negligence.

The principal ground upon which defendant bases this claim is that the space along the platform between the building and the track was exceedingly dangerous; that Graham was thoroughly familiar with the situation, his duties as assistant yardmaster requiring him to know the movements of trains and the time of their passing that point; that on this occasion he knew the engine was coming, because he came out of his office on the platform at a time when he saw it approaching at a

distance not greater than two hundred or three hundred feet to the west, and looked in that direction. It is therefore urged that he assumed the risk of working there, or, if he knew the engine was coming, he was charged with the duty of getting out of its way, and, if caught on the platform, or near the east end thereof, it was the result of his own carelessness. The position of defendant is, conceding the negligence of its employees in running the engine at eighteen or twenty miles an hour when the customary speed was six or eight miles, yet the yardmaster was required to perform his duties in and about the building and assume the responsibility of attending to such business notwithstanding trains and engines might be manipulated contrary to the custom. In our judgment, the application of such a rule would be unnecessary and unwarranted, and would not inure to the best interests of the service.

When employees are required, in the performance of their duties, to occupy places of peril, the master should not thus be permitted to shift responsibility if it conducts its business in such manner as to cause the employee to assume that he may safely take such line of conduct into account in controlling his own movements. In this case it clearly appears that there was a reason for the rule requiring engines and trains to slow down in order to get the proper signal to go on. The switchman at his post was required to inform himself whether it was proper to give such signal, and the act itself of passing through a yard at a rapid rate of speed, where switches may necessarily have to be manipulated, is fraught with danger. Assuming that Graham saw the engine approaching some two or three hundred feet to the west upon coming out of the door to the platform at the west end of the shanty, he had a right to believe that it was in the process of slowing down to the accustomed speed in order to receive the signal, and that the engine would not pass the switch shanty faster than six or eight miles an hour. It cannot be said, as a matter of law, that he was guilty of contributory negligence because he took only the time usually necessary under such circumstances to pass the building and get out of the way. It does not exactly appear where Graham was when struck by the engine. Some of plaintiff's witnesses said he was on the platform, about eight feet west from the east end of the building. It seems

clear that he was picked up at a point about twelve feet from the east end of the building, and some little distance south from the track. It does not conclusively appear that he had passed entirely to the east of the shanty to the platform and was carelessly walking along too near the track. From the location in which he was found, the direction he was walking, the speed of the engine, and the manner in which he was struck, there is nothing improbable in the theory that he may have been upon the platform some little distance west of the east end of the building. It must be assumed that he was engaged in the performance of his duties, using reasonable care.

Under all these circumstances it was a fair question for the jury to determine whether or not he knew the engine was approaching, and assumed it would follow the accustomed practice, and slow down to the usual speed, giving him sufficient time to pass around the building before being overtaken; and whether, while so engaged, he was exercising ordinary care, and did not hear the signals, if any were given. Bearing upon the question of rules and custom in cases of this character, the following authorities may be considered: Loucks v. Chicago, M. & St. P. Ry. Co., 31 Minn. 526, 18 N. W. 651; Rahman v. Minnesota & N. W. Ry. Co., 43 Minn. 42, 44 N. W. 522; Westaway v. Chicago, St. P., M. & O. Ry. Co., 56 Minn. 28, 57 N. W. 222; Hooper v. Great Northern Ry. Co., 80 Minn. 400, 83 N. W. 440; Walker v. St. Paul C. Ry. Co., 81 Minn. 404, 84 N. W. 222.

Order affirmed.