## JOSEPH J. KOTEFKA v. CHICAGO, ST. PAUL, MINNEAPOLIS & OMAHA RAILWAY COMPANY and Others.[1]

May 26, 1911.

Nos. 17,000—(85).

**Question for the jury.**
> In this a personal injury action, the question of the defendant's negligence, under the evidence, was a question of fact for the jury.

**Contributory negligence.**
> It conclusively appears, by the testimony of the plaintiff himself, that under the existing circumstances, as shown by uncontradicted evidence, he failed to exercise due care for his safety, and as a matter of law was chargeable with contributory negligence.

Action in the district court for Ramsey county against defendant railway company, Dennis C. Kurley and Henry G. Ofelt, to recover $25,000 for personal injuries. The separate answers of defendants alleged contributory negligence on the part of plaintiff. The case was tried before Kelly, J., and a jury which returned a verdict in favor of plaintiff for $12,500. From orders denying defendants' separate motions for judgment notwithstanding the verdict and denying their motions for a new trial if plaintiff should consent to a reduc-

[1] Reported in 131 N. W. 482.

tion of the verdict to $9,000, they separately appealed.   Reversed and new trial ordered.

*James E. Markham,* for appellants.

*C. C. McElwee* and *Dan J. Hollihan,* for respondent.

SIMPSON, J.

This is an action brought by plaintiff to recover damages for an injury which he received while working as a switchman in the employ of the defendant in its yards in East St. Paul.   Upon the trial plaintiff had a verdict.   From an order denying its alternative motions for judgment notwithstanding the verdict or a new trial, defendant appeals, and here urges that the evidence submitted on the trial wholly fails to show that plaintiff's injury was caused by the negligence of the defendant, and that the evidence does clearly show that it was caused by the negligence of the plaintiff himself.

The material facts established by the evidence bearing directly on the defendant's negligence, are as follows:

Plaintiff, in the course of his employment, was directed to take engine No. 217 and detach four freight cars from the east end of a string of cars on the so-called double track and weigh and return them.   The engine backed in from the east on the double track, plaintiff riding in front on the footboard.   As the engine approached the string of cars, plaintiff stepped off away from the track a couple of steps and watched the coupling.   The next track to the south of the one on which engine No. 217 was standing is the so-called west-bound main track.   The space between these two tracks is thirteen feet, allowing four feet in the clear between trains.   After plaintiff saw his engine coupled onto the east end of the string of cars, he walked westerly between the tracks and upon the end of the ties of the west-bound main track a distance of twenty or twenty-five feet, when he was struck by engine No. 229, which was going west on the west-bound main track.   The west-bound main track was used by all through trains going west, and at times by transfer trains.   Engine No. 229 was the transfer engine engaged in hauling trains between the yards and the Minneapolis transfer.   At the time it struck the plaintiff the engine was being backed west on the west-bound main

track for the purpose of taking out a train, and on it were the engineer, fireman, and two switchmen. They were running at least eight miles per hour. The engineer was riding in the south side of the cab, from which position he had a view of the track within fifty or one hundred feet of the front of the engine; but he did not see the plaintiff near the track until after his injury. The front switchmen, Ofelt, who was riding on the footboard of engine No. 229, testified that when he got within a car length of engine No. 217 he saw the plaintiff step off that engine and make signals to his engineer; that after the engine was coupled to the first car he saw the plaintiff start walking west, and that the plaintiff was then looking west; that engine No. 217 was popping at the time, which might have prevented the plaintiff from hearing the sound from the approach of engine No. 229; that he saw the plaintiff kind of swerve towards the west-bound main track; that he hollered at him, and tried to get across on the footboard to push him out of the way, but could not do it in time. On the front of the engine was the air hose with a stopcock. By turning this he could have applied the air brake to the engine when he saw the plaintiff in a place of danger; but he made no attempt to apply the brake, nor to give any signals to the engineer. The fireman on engine No. 229 testified that he was looking out of the cab window on the north side, and saw plaintiff as he stepped off the footboard, and that the plaintiff was then not over thirty feet distant from engine No. 229; that he at once called to the engineer to apply the emergency. The engineer on engine No. 229 testified that he applied the emergency brake immediately upon getting the signal; that his engine ran about sixty feet after striking plaintiff before it came to a stop. There was evidence that it was the custom of those in charge of switching or transfer engines, while operating on the main lines, to keep a lookout for switching crews working on the double tracks, and to have their engines under control while passing near men so engaged.

Under this evidence, the question whether trainmen in charge of engine No. 229 were negligent in operating the engine in such a manner as to cause the injury to plaintiff was a question for the jury. It appears from the evidence that they knew that engine No.

217 had just gone down the double track for the purpose of doing some work, and they were chargeable with notice that, in doing this, some of the crew of engine No. 217 were likely to move along the cars on the south side of the double track, and be exposed to danger from engine No. 229. Under these circumstances it was for the jury to say whether the engineer and crew of engine No. 229 kept this engine under such reasonable control as was usual and customary in this yard under those circumstances, and as required for the safety of other crews, and whether a failure so to do was the proximate cause of the injury to the plaintiff.

In considering the question whether the evidence establishes that the plaintiff, by his own negligence, contributed to his injury, involving, as it does, the conduct of the plaintiff immediately prior to the accident, we have relied upon the plaintiff's testimony.

The plaintiff testified in substance that, when he went down on the double track in the morning in question to couple onto the string of cars, he knew that the west-bound main track was used continuously for west-bound traffic, and was liable to be used at every and any moment; that any switch or transfer engine might use it going west; that it was a live track, and was a dangerous track all the time to be near or on; that he knew at the time in question that they were waiting for engine No. 229 to go down from the east upon this track and couple on the west end of the transfer; and that engine No. 229, the one that struck the plaintiff, would come down there at any time on that west-bound main track; that, while he was riding on his engine going west, he was on the south side of the footboard at the westerly end of the engine; that his engine moved west at the rate of four or five miles an hour; that he went along leisurely—there was no hurry—he had plenty of time to get down there and get the four cars out; that when he approached the string of cars he got off leisurely, knew what he wanted to do, had time to think over just how he would do it, and what he had to do, and there was no occasion for haste or hurry; that there was nothing to cause him to be confused in any way in respect to the work he was doing; that when he stepped off the engine he walked south, took a step or two that way, walking slanting and watching the coupling at the same time; that he did

not look toward the east at all; that at any time, in moving from the east end of the yards down to the place where the coupling was made, he could have looked east up the west-bound main track and seen the track for one thousand or twelve hundred feet; that, if he had so looked at any time before he stepped off the engine, he would have seen engine No. 229, which struck him. "Q. So this accident wouldn't have occurred, if you had looked to the east at any time just before you stepped off while you were moving from Payne avenue to the place of the accident? A. I suppose not."

The plaintiff testified that, after he stepped off the engine, all he had to do, after he saw the engine coupled to the string of cars, was to walk down four cars and cut off the fourth car from the transfer; that he walked twenty or twenty-five feet west between the tracks, walking just at the edge of the ties of the west-bound main track. Plaintiff testified that during all the time he was walking the twenty-five feet in that position he was in danger of being struck by some engine or car moving on the west-bound track; that while he walked the twenty-five feet he had ample time to go slowly and think about what he was doing. "Q. There wasn't anything to divert your attention there away from your work, or away from the dangers of the yard? A. No, sir; there wasn't. * * * Q. A switch engine might come down there any time that you had to look out for? A. Yes; that is true. * * * Q. And you knew all the time you were right up close against the north rail of the west-bound track? A. Yes. Q. And you knew, if any engine came down that track, that you would get caught if you didn't get out of the way? A. Yes." Plaintiff testified that he did not at any time look towards the east, and that, if he had looked at any time prior to his injury, he would have had an unobstructed view of the approach of the engine which struck him.

Upon re-direct examination, the plaintiff testified as follows: "Q. Just what were you doing, Joe? * * * Mr. Sheean has made it appear like a pleasure trip. A. I went down there to do my work, as I was ordered to do. Q. What did you do? A. Just as I stepped off the footboard, I looked at the cars and the coupling too. Q. What were you doing as you walked down west? A. Walking down

there to uncouple them cars and take them up on the scale. Q. What else were you doing in connection with your cars as you walked west? A. Looking at the train, to see whether they were together." He further testified that, just at the moment he was struck, he had thrown up his arms to give a signal.

From this evidence it clearly appears that plaintiff failed to exercise due care for his safety. The plaintiff, while doing his work as a switchman in the defendant's yards, was bound to exercise the care which persons of ordinary care would exercise under like circumstances for his safety. While the rule requiring ordinary care is a uniform rule, the acts which a person of ordinary care would do to safeguard himself vary under varying conditions. As applied to a switchman engaged in his work about a railroad yard, it is apparent that the work required of him often involves close attention and quick, accurate action with reference to the particular movement of the cars in which he is assisting. Under these circumstances, he cannot take the precautions for his safety in looking out for other trains that a person not so engrossed in his duties might take, and this court has frequently applied the test of ordinary care to employees working about switchyards with due regard to such circumstances. Graham v. Minneapolis, St. P. & S. Ste. M. Ry. Co., 95 Minn. 49, 103 N. W. 714; Joyce v. Great Northern Ry. Co., 100 Minn. 225, 110 N. W. 975, 8 L.R.A.(N.S.) 756; Floan v. Chicago, M. & St. P. Ry. Co., 101 Minn. 113, 111 N. W. 957; Cornell v. Great Northern Ry. Co., 112 Minn. 341, 128 N. W. 22.

It would, however, be a manifest misinterpretation of the principles involved in these cases to hold that, merely because a person is employed as a switchman, he is thereby so engrossed in his work that he is excused from taking the usual means of avoiding danger. It would, indeed, be difficult to conceive of any set of circumstances more clearly charging a man with the duty of looking out for an approaching train, and at the same time affording him a fuller opportunity to do this, than the circumstances here present. The plaintiff had full knowledge of imminent danger, was performing no duty requiring attention, and was free to observe his surroundings at all times while he consecutively rode on the footboard of a slowly

moving engine, stood still, and walked leisurely a distance of twenty-five feet. Yet he neither walked in the clear space between the tracks, nor glanced east to see if the expected engine was coming. His conduct was wholly lacking in any of the acts obviously required in the exercise of the slightest care for his safety. The motion made by the defendant for a directed verdict in its favor, under this evidence, should have been granted. Magliani v. Minnesota Transfer Ry. Co., 108 Minn. 148, 121 N. W. 635; Hammer v. Great Northern Ry. Co., 113 Minn. 212, 129 N. W. 219.

While the evidence as it stands on this trial entitles defendants to judgment, it does not necessarily follow that this court should order judgment notwithstanding the verdict. Cruikshank v. St. Paul F. & M. Ins. Co., 75 Minn. 266, 77 N. W. 958. The conduct of the plaintiff must be tested by the surrounding circumstances. A fuller showing of the existing conditions may be made, and thereby a question of fact be raised as to whether the plaintiff was, at the time of his injury, exercising ordinary care for his safety.

The order of the trial court denying defendant's motion for a new trial is reversed, and a new trial ordered.

Lewis, J. (dissenting).

I differ from the views of the majority on the question of contributory negligence, and first call attention to the evidence bearing on that subject, not referred to in the opinion.

Ofelt testified that plaintiff did not stop after he got off his engine. "He walked kind of west, looking at the cars, and then looking at Casura there, to see whether they were coupled together, giving signals for the engineer to come ahead." (Folio 279.) This witness also stated that plaintiff's attention was on his work. (Folio 318.) Casura, a switchman stationed four cars west of plaintiff, testified that plaintiff walked diagonally towards the west-bound main track, at the same time giving a signal to slack ahead, which indicated that the engineer was to slack ahead enough to take up the slack of this string of cars, to see that they were all coupled (folio 242); but, before the engineer could or did respond to the signal, 229 came down and struck him (folio 250).

Plaintiff was a very frank, responsive witness, and on cross-examination was led to make admissions which should not control. When asked to state in his own way how it happened, he said: "I made four steps watching that coupling, and when that coupling was made I started down to make my own cut, and made about eight steps more, and just as I started down there, when I finished up the eight steps, I got a glance of Casura. Just as I got a glance of Casura, I gave him the signal, and just as I had my arms up I was hit." (Folio 372.) "When it hit me it hit me like a streak of lightning." (Folio 373.)

The portions of plaintiff's testimony set out in the opinion were given in response to cross-questions; but at folio 457 he stated that he was engaged in his work, and at folio 380 that in doing his work he relied on the custom of looking out for switchmen while operating in that place. He knew the time of all the regular trains, and it was the custom to notify the switchmen of all specials. (Folio 477.) At folios 501, 502, and 512, plaintiff explains why he walked so far south towards the west main. It was to see whether the cars he was to take out were coupled together, and that his attention was on the cars. No. 229 was the only engine under steam in the yard, and was at the water plug when plaintiff's engine passed up west on the lead track. (Folios 363, 364.) It was not expected up on the main so soon, and about three times out of five it went west through the new yard, instead of on the west main. (Folios 507, 508.) Plaintiff's negligence is placed on his neglect to look east while walking the eight steps. To walk eight steps at a moderate rate only requires about seven seconds. During those seven seconds plaintiff's attention was on the cars, to see if they were coupled. He had no reason to expect 229 at that particular time, although he knew she might come up the west main to arrange for the transfer train. He might have looked east and avoided danger, had it occurred to him; but because he did not look, under the circumstances, should not condemn him as guilty of contributory negligence.

The two cases cited as authority are different in the facts. In Magliani v. Minnesota Transfer Ry. Co., the plaintiff was not engaged in any duty whatever, but was passing through the yards on

his way to his boarding house. In the Hammer case, the plaintiff was going to the water tank to assist in starting an engine, and walked down the track instead of in a safe place beside it. He stopped, and was absorbed in lighting his pipe, but not in the performance of his duties. In my judgment, this case is clearly within the principles of the Graham, Joyce, Floan, and Cornell cases. Whether plaintiff was guilty of negligence during that seven seconds is a question concerning which reasonable men may differ, to say the least.

I therefore dissent.